**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles Layton COX, Defendant-Appellant.**

**No. 17484.**

United States Court of Appeals, Seventh Circuit.

June 16, 1970.

Rehearings Denied June 29, 1970 and July 1, 1970.

Michael J. Zimmer, Milwaukee, Wis., Charles Layton Cox, for defendant-appellant.

David J. Cannon, U. S. Atty., Richard E. Reilly, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, CUMMINGS and KERNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Appellant Charles Layton Cox was indicted for the November 17, 1967, robbery of the Silver Lake State Bank in Silver Lake, Wisconsin, and for jeopardizing the lives of the employees of the bank by the use of a dangerous weapon. After a jury trial, he was found

guilty of violating Sections 2113(a) and (d) of the Criminal Code (18 U.S.C. §§ 2113(a) and (d)) and sentenced to imprisonment for 24 years.[1]

Appellant does not challenge the sufficiency of the evidence which discloses that on the morning of November 17, 1967, two men robbed the bank of approximately $13,000. They were both armed and wearing "halloween-type" masks of human faces. One of them, apparently Cox, placed the money he took from the tellers in a "Sentry" shopping bag while the other, Phillip Royale, accompanied two bank officers to the vault. Before the vault could be opened, the robbers fled the bank parking area in a maroon Buick with Illinois license plates.

Kenosha County Deputy Sheriff Gerald Van Patten heard of the robbery in a bulletin broadcast on the sheriff's radio. He saw the getaway car approach on Highway 50 leading from Silver Lake and blocked its path with his police car. The Buick swerved past him, and a pistol shot from the passenger side of the Buick injured him slightly by grazing the back of his head. Van Patten then chased the Buick at high speeds until it hit a telephone pole. As he approached the Buick, he observed two unmasked men alongside. The man who had been on the passenger side of the car fled east, while his accomplice ran north. The man running east stopped and turned at least three-quarter face toward Van Patten for a number of seconds at a distance of 45 to 60 feet. Van Patten testified this was Cox. Van Patten said the runaway was bareheaded, wearing a shiny red or maroon jacket, dark pants, light socks, and carrying a dark jacket in his right hand. He had a fairly large nose and thin mouth. Van Patten did not notice that Cox had a deformed or missing right ear.

Van Patten abandoned Cox and proceeded in pursuit of the accomplice, Phillip Royale, whom he killed with one shot at a distance of over 85 feet. Although astigmatic, Van Patten does not need his glasses to see well and shoots almost equally well without his glasses. One of the guns taken from Royale was later identified as having been used in the bank robbery.

A few minutes after the exchange of gunfire between Van Patten and Royale, Paul Breski, a farmer in the vicinity, observed Cox in his apple orchard. Cox, who appeared excited, told Breski that he had been stealing gravel from a mound nearby and that there had been an accident with somebody hurt or killed. Cox said he wanted to call an ambulance. He said his car was at a spot 600 yards from Breski's farm. However, Cox offered Breski's hired man $5 to take him from the farm to the nearest town.

Later in the afternoon on November 17, Cox persuaded two reporters to drive him to his Ford Mustang, which was actually four and one-half miles from the Breski farm. He told the reporters that he had come into the area with a "buddy" to get some gravel, and that his buddy was deputized to search for the bank robber. Cox explained that he himself was not deputized because he was afraid of guns.

When the Buick and immediately surrounding area were searched, another gun used in the robbery was found, along with the "Sentry" shopping bag filled with bank loot and the two masks. A hair sample was removed from the cracked windshield of the Buick and sent to the Federal Bureau of Investigation laboratory. An expert witness testified that he compared that sample with a sample of Cox's hair and found that they had the same characteristics.

At a conference between law enforcement officers on the night of November 17th, Cox became one of the possible suspects. On the following morning, Van Patten viewed four photographs of Cox and instantly identified him as the passenger who ran east from the Buick on the previous morning. Cox was arrested

---

1. Cox's earlier conviction on these charges was set aside because of a faulty indictment (285 F.Supp. 367 (E.D.Wis.1968)).

later that day and charged with the robbery of the Silver Lake State Bank.

### 1. *Validity of the Pre-trial Identification*

Defendant first objects to the denial of his pre-trial motion to suppress Officer Van Patten's identification of Cox as the individual who fled from the Buick. Defendant argues that he was denied due process under Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, because the trial identification by Van Patten allegedly followed a "photographic identification procedure * * * so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (390 U.S. at p. 384, 88 S.Ct. at p. 971). We agree with the district court that the hazards of a faulty initial identification in this case could be obviated by cross-examination as suggested in *Simmons*.

█ The validity of a photographic identification is to be decided upon the particular facts of the individual case. Simmons v. United States, *supra*, at p. 384, 88 S.Ct. 967. As the Court there recognized, complete insulation of identification procedures from all risk of error or incorrect suggestion is impossible. To be sure, dangers inherent in the use of photographic representations are increased when pictures of only a single individual resembling the suspect are viewed. Under certain circumstances, such a "highly suggestive photographic viewing" may be so improper as to call for suppression of any subsequent identification because of the risks of injustice. *E. g.*, Young v. United States, 132 U.S.App.D.C. 257, 407 F.2d 720, 721 (1969), certiorari denied, 394 U.S. 1007, 89 S.Ct. 1608, 22 L.Ed.2d 786; Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176, 1182 (1969). A flawed procedure, however, does not require suppression in every instance. In *Simmons* itself, the Court upheld the use of the photographic identification although the defendant was present in several of the pictures shown witnesses. Here too, ad-

ditional facts warranted the submission of any questions of the accuracy of Van Patten's identification to the jury.

█ There is no indication that the FBI agents employed an unnecessary or intentionally suggestive procedure. As in *Simmons*, the photographic identification followed on the heels of a felony in which the suspects had attempted flight with the aid of violence. Immediate action was necessary to prevent escape of the remaining accomplice and "[i]t was essential for the FBI agents swiftly to determine whether they were on the right track * * *." 390 U.S. at p. 385, 88 S.Ct. at 971. Risks of misidentification were lessened in this case by the number of photographs, taken at different times and angles, which were shown Van Patten.

In addition, the circumstances of the observation, as well as Officer Van Patten's police training, militate against substantial dangers of implanting erroneous identifications from the photographic viewing. Officer Van Patten testified that his view of the fleeing accomplice took place under conditions of good visibility at a reasonably short distance and for a period of several seconds. There is also additional circumstantial evidence which corroborates the identification of Cox made by the witness. Cox was clearly placed in the surrounding vicinity, and his own remarks to others on the day of the robbery connected him with the incident. Moreover, hair samples taken from the Buick bore the same characteristics as Cox's hair.

In United States v. Kilgore, 418 F.2d 225 (9th Cir. 1969), the defendant also objected to the in-court identification made by an Immigration Inspector who had viewed two photographs of the defendant five months before trial. Rejecting the challenge, the Court observed that

"the officer whose identifying testimony was challenged was a qualified observer with much experience. There is no indication that he was subjected to suggestive influence or that his identification of Kilgore's photographs

was corrupted in any manner. In open court, he identified Kilgore as having been the driver of the automobile at the time in question, and this identification finds corroboration * * *. The appellant's counsel was afforded all reasonable latitude in his cross-examination of the identifying officer." 418 F.2d at p. 226.

We are in accord with those conclusions and find them equally applicable to the case before us. We therefore hold that no denial of due process resulted from the pre-trial identification procedure and from the admission of Officer Van Patten's in-court identification of defendant Cox.

## 2. The Seizure of Defendant's Hair

■ Defendant next contends that the Government violated his Fourth Amendment right to be free from unreasonable searches and seizures when the Federal Bureau of Investigation obtained a sample of defendant's hair and had it analyzed. Defendant argues that hair samples, no less than the blood samples taken by police in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, "plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of that Amendment" (384 U.S. at p. 767, 86 S.Ct. at p. 1834). Moreover, Cox claims, the Court's opinion in Schmerber itself indicates that only the threatened bodily destruction of the evidence sought, which created an emergency, justified drawing the blood sample without prior recourse to an impartial magistrate for a search warrant: "Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned" (384 U.S. at p. 770, 86 S.Ct. at p. 1835). Since no emergency existed in this case, Cox contends that a warrant was a mandatory prerequisite to the seizure of the hair samples. We do not reach the question whether the Constitution obliges the police to obtain a warrant before obtaining hair samples from prisoners.[2] We conclude instead that in this case, the "seizure" did not occur when the hair was cut but when the Government preserved and appropriated the clippings which defendant had voluntarily abandoned.

The hair samples in question were obtained as the result of a haircut given Cox while he was in the Waukesha County Jail in the custody of state officials. Such haircuts are regularly given inmates by prison officials in connection with the regulation of the personal hygiene of prisoners. This record does not show that Cox's haircut was not an ordinary barbering incident. It was administered pursuant to jail procedures by a deputy sheriff over a month after defendant's arrest. There is no indication of any irregularity in the treatment accorded Cox in the administration of the haircut. During the course of the haircut and at the request of the FBI, the "barber" preserved clippings which he had cut from Cox's head in an envelope which he subsequently transmitted to the FBI for analysis.

At no time has defendant objected to the legality of the prison procedures under which he received his haircut. He has never claimed that the haircut was illegally or improperly given. The thrust of his contention is rather that a warrant should have been obtained before the shorn locks were appropriated by the state officer for analysis. Cox, however, never indicated any desire or intention to retain possession of the hair after it had been scissored from his head. Clippings such as those preserved in the instant case are ordinarily abandoned after being cut. Cox in fact left his hair and has never claimed otherwise. The deputy sheriff was not ob-

---

2. Without expressing approval or disapproval of the conclusions reached in that case, we note that United States v. D'Amico, 408 F.2d 331, 333 (2d Cir. 1969), refused to find any constitutional requirement for a search warrant where the officer snipped a few strands from the head of the prisoner.

liged to inform him that, if abandoned, his hair would be taken and analyzed. Having voluntarily abandoned his property, in this case his hair, Cox may not object to its appropriation by the Government. Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668; United States v. Minker, 312 F.2d 632, 634–635 (3d Cir. 1962), certiorari denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978; United States v. Cowan, 396 F.2d 83, 86–87 (2d Cir. 1968); Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, 564–565 (D.C. Cir. 1968), certiorari denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126. Defendant's intent in discarding his severed hair is no less clear because it involved no affirmative act on his part. United States v. Cowan, 396 F.2d 83, 87 (2d Cir. 1968); Friedman v. United States, 347 F.2d 697, 701–706 (8th Cir. 1965), certiorari denied, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354; Feguer v. United States, 302 F.2d 214, 249 (8th Cir. 1962), certiorari denied, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110.

### 3. *Propriety of the Prosecutor's Closing Argument*

Appellant also urges that the closing argument of the prosecutor contained a comment on the defendant's failure to testify, and therefore violated his Fifth Amendment rights as construed in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106.

 In his closing remarks, the Assistant United States Attorney referred to the conversation between defendant and the two newspaper reporters who drove him from the Breski farm to his automobile, stating:

> "There was a discussion that we think also is quite pertinent. Mr. Cox was to have said at that time: 'I was with a buddy, but my buddy was deputized. I wasn't because I'm afraid of guns!'

Where is that buddy? He's the key to the defense of this case. His identity, his whereabouts are locked up in the knowledge of the defense. We don't know. We have no knowledge to know where he is or who he is."

These observations, unlike the statements in *Griffin*, make no direct reference to the silence of the accused.[3] Nor was the language used manifestly intended or naturally and necessarily tantamount to a comment on the failure of the defendant to testify. United States v. Lyon, 397 F.2d 505, 509 (7th Cir. 1968), certiorari denied, sub nom. Lysczyk v. United States, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117. The Fifth Amendment does not prohibit proper advocacy of the strength of the prosecution's case, either absolutely or relative to the defense. See United States ex rel. Leak v. Follette, 418 F.2d 1266, 1268–1269 (2d Cir. 1969). The designedly exculpatory remarks of Cox on the day of the robbery were fair game for comment. The prosecutor was within the bounds of propriety in exploring the implications which those out-of-court statements might have for the Government's case. He was equally free to argue the lie of the alibi. Proper advocacy justified stressing the desired inferences by noting that Cox's "buddy," who could presumably unlock defendant's cell, nevertheless remained mysteriously anonymous and silent. Cf. United States v. Marcus, 401 F.2d 563, 567 (2d Cir. 1968), certiorari denied, 393 U.S. 1023, 89 S.Ct. 633, 21 L.Ed.2d 567; Camacho v. United States, 407 F.2d 39, 45 (9th Cir. 1969), certiorari denied, 396 U.S. 944, 90 S.Ct. 380, 24 L.Ed.2d 245; Hayes v. United States, 368 F.2d 814 (9th Cir. 1966); Talbot v. Nelson, 390 F.2d 801, 803 (9th Cir. 1968); Jacobs v. United States, 395 F.2d 469, 477 (8th Cir. 1968); United States v. Nasta, 398 F.2d 283, 285 (2d Cir. 1968).

---

3. In *Griffin* the prosecutor noted in his closing statements that

"These things [the defendant] has not seen fit to take the stand and deny or explain.

"And in the whole world, if anybody would know, this defendant would know." (380 U.S. at p. 611, 85 S.Ct. at p. 1231.)

### 4. Limitations on Impeachment by Proof of Prior Convictions

██ Defendant finally claims error in the trial judge's denial of his motion, made before trial, to limit the Government's ability to impeach Cox by proof of prior felony convictions in the event that he should testify in his own behalf. Defendant argues that the failure of the court to exercise its discretion by ruling prior to trial upon excluding or admitting his previous felony convictions for impeachment purposes forced defendant to remain silent rather than risk misuse by the jury of his record of such convictions.

Assuming the district court's denial of Cox's motion to have been prejudicial,[4] we conclude that it was correct. The accused who must risk prejudice to his case from misuse of prior convictions faces a lamentable dilemma. Numerous alternatives have been proposed as remedies to this difficult tactical and evidentiary knot. With few exceptions, however, the general practice remains to treat the accused like any other witness. See United States v. Morefield, 411 F.2d 1186, 1188 (7th Cir. 1969); Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 6–09, pp. 123–124, 126–127 (March 1969), 3 Wigmore on Evidence, §§ 889–891 (1940). Individual judges may prefer imposing limitations upon such impeachment in the exercise of their discretionary powers over the introduction of relevant evidence. This may vary according to the facts at issue and the nature of the convictions offered for impeachment. We are not, however, persuaded that any limitation such as the "rule of thumb" offered by Gordon v. United States, 127 U.S.App.D.C. 343, 383 F.2d 936, 940 (1967), and United States v. Palumbo, 401 F.2d 270 (2d Cir. 1968),[5] provides such a manifestly satisfactory resolution of these difficulties as to compel our imposition of the rule upon trial judges. We therefore find no error in the denial of defendant's motion.[6]

Pursuant to the Criminal Justice Act of 1964, Michael J. Zimmer of the Milwaukee Bar was appointed to represent appellant in this Court. His model services merit our commendation.

The judgment is affirmed.

---

4. The motion and record of the proceedings below fail to disclose the particular felony convictions which defendant sought to exclude. No further attempt was made on the part of defense counsel to raise the issue at the appropriate stage in the trial. Defendant himself did not testify, thus rendering speculative any determination of the value of his testimony and the extent of any prejudice from impeachment of this type.

5. The rule of thumb laid down in those cases is that only convictions for acts of deceit, fraud, cheating, stealing and others resting on dishonest conduct should be admitted to test credibility, and even they should be excluded if stale and followed by a legally blameless life.

6. In a pro se supplemental brief, appellant objects to the court's instruction, ██ given to the jury at the close of the evidence, that

"Until all 12 of you agree to the verdict, you have not arrived at a verdict which the court can accept."

The context in which this instruction was given clearly reveals that it was only tantamount to a statement that the verdict must be unanimous. It was given before the deliberations were commenced, and was followed by specific exhortations to the jurors to exercise their individual judgment in passing on the evidence. It contained none of the coercive elements of the Allen charge (33 F.R.D. 611–612). Apparently no objection was interposed to the instruction at the trial. Finally, even Allen charges were permissible at the time of this trial, which was prior to our decision in United States v. Brown, 411 F.2d 930 (7th Cir. 1969).