**UNITED STATES**

v.

**Gene Tony KULP et al.**

**Crim. No. 72-272.**

United States District Court,
E. D. Pennsylvania.
Oct. 25, 1973.

Robt. E. J. Curran, U. S. Atty., Barton A. Hertzbach, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff gov't.

Louis M. Natali, Jr., Philadelphia, Pa., for Kulp.

Jack M. Myers, Philadelphia, Pa., for Powell.

Edward Reif, Philadelphia, Pa., for Dougherty.

EDWARD R. BECKER, District Judge.

## OPINION

### I. *Preliminary Statement*

The defendants in this case were charged with receiving and concealing goods in excess of $5,000 moving in interstate commerce from Dallas and Houston, Texas to the Eastern District of Pennsylvania, knowing the same to have been stolen.[1] The three defendants whose post trial motions are before us (Kulp, Dougherty and Powell), were jointly tried and were convicted by a jury.[2] Their motions have been variously denominated as motions for judgment of acquittal (Rule 29(c)), new trial (Rule 33), and arrest of judgment (Rule 34), and they raise a variety of points which may be enumerated as follows: *First*, all defendants claim that the admission of evidence obtained from a search of Dougherty's automobile and of other evidence seized from a trash dump behind Kulp's home was error. *Second*, the defendants all contend that it was error to permit certain in-court identifications of Kulp and Powell. *Third*, all defendants submit that it was error to refuse to allow them to withdraw from a stipulation entered into on the eve of trial as to the ownership of certain stolen property, when it appeared at trial that one of the witnesses (Mrs. Diane Fennekohl) had become disabled and could not have appeared to verify ownership had she been called. *Fourth*, all defendants assert that it was error not to declare a mistrial when, by reason of the non-appearance of Mrs. Fennekohl, the United States Attorney could not connect certain silverware (not included in the stipulation) to the case.[3] *Fifth*, Powell asserts that we erroneously denied his motion for severance. *Sixth*, Powell claims that we erred by failing to give a "missing witness" charge. *Seventh*, Dougherty argues that we erred in denying his motion for judgment of acquittal in that the verdict was not supported by the weight of the evidence. *Eighth*, Kulp asserts that he was prejudiced by a witness's reference to pictures.

It will be helpful at this juncture to set forth briefly the evidence adduced at trial.[4] All of the evidence on the events in question was put on by the government; none of the defendants took the witness stand. Only Dougherty put on any evidence, and that was character evidence.

Briefly summarized, the government established the following points by the testimony of F.B.I. agents, especially of Special Agent James Aardweg. (1) On the evening of March 20, 1972, a number of F.B.I. agents set up a surveillance of the home of Kulp in Morwood, Pennsylvania, in a rural section of Montgomery County. (2) The agents saw several male figures milling about and loading packages into a Cadillac automobile protruding from Kulp's garage. (3) When the Cadillac and another vehicle left Kulp's premises, the agents followed and stopped them. (4) They found Dougherty to be the driver and Powell a passenger of the Cadillac in question and Dever to be a passenger of the other

---

1. 18 U.S.C. § 2315.

2. Kulp, Dougherty and Powell were charged in Counts IV and V of the indictment and the jury convicted them on both counts. Only the defendant Dever was charged in Counts I, II and III of the indictment, and he pleaded guilty to those counts prior to trial.

3. F.B.I. agents had recovered the silverware from the trash dump behind Kulp's home,

and the prosecutor had placed it in the courtroom in the jury's view and asserted in his opening statement that he would tie it into the case.

4. The evidence developed at the suppression hearings will be recounted under the headings which discuss the search and identification suppression motions.

car. (5) They observed in plain view in the back seat of Dougherty's cars several suitcases that matched the description of those reported as stolen in Texas. (6) They seized those suitcases, including one with a tag marked "American Airlines Flt. 442." (7) They later opened the trunk of Dougherty's car with the keys that he gave them and procured therefrom another suitcase and a footlocker. Appended to the footlocker was an REA Air Express shipping tag indicating that it had been shipped on March 13, 1972, from Houston to Philadelphia and held for one B. Dever. (8) All of the suitcases and the footlocker were opened and were found to contain substantial quantities of proof coins, stamps, jewelry and other valuable articles. (9) The government also established that Dougherty was a jeweler.

The next elements of the government's case were established by stipulation. First, it was stipulated that the goods found in Dougherty's car were the same goods that had been stolen between March 12th and 18th from three identified homes in Texas. Second, it was stipulated that the goods mentioned in the first stipulation had a value in excess of $5,000. The stipulations obviated the necessity of the government's bringing witnesses from Texas to establish ownership and theft of the goods.

The government next proceeded to link Kulp and Powell with the transportation of the stolen goods from Texas to Pennsylvania. Ollie Johnson, who was employed by REA Air Express in Dallas on March 18 made an in-court identification of Powell. He testified that he was "pretty sure" that Powell was one of the men who shipped some luggage from Dallas to Philadelphia on March 18th. He had talked to Powell at the time and remembered the shipment because of the unusual weight of the luggage. Johnson also testified to serial numbers which matched the serial numbers on one of the REA slips used in Philadelphia to pick up the suitcases. Agent Mullins of the F.B.I. then testified that Johnson had also selected photographs of Dever and Powell on April 3, 1972, as the men who shipped the luggage in question. The photospread itself was not introduced.

Donna Kay, a stewardess for American Airlines, positively identified Kulp in court as a man who was aboard flight 442 from Dallas to Philadelphia on March 19, 1972. She testified that she remembered him because (1) he was casually dressed, which is not typical of first class passengers; (2) he sat with a short man without talking or moving about as much as was usual; (3) he was about 6′1″ tall, which is about as tall as Miss Kay's brother; (4) he had blondish color hair; and (5) he had very craggy facial features, with high cheekbones and a thin strong jaw.

Thomas Burns, an REA Air Express employee at 30th Street Station in Philadelphia, identified Kulp in court as one of the men who on March 20 picked up some exceptionally heavy luggage which had arrived from Dallas. He testified that the man resembled Kulp very much. He stated that he remembered the man because he had talked to him about a gun rack on the back of his truck and because of the unusual weight of the luggage.[5] Burns also identified the REA shipment receipts.[6]

Joseph Maloney, also employed at 30th Street Station, testified that he had talked to Dever when Dever signed for the suitcases and had seen others with Dever, but he could not identify any of Dever's companions. He testified that the luggage was particulary heavy and had been shipped from Houston and Dallas.[7]

---

5. Indeed, he recalled saying to Kulp, "have you got your mother-in-law in there?"

6. F.B.I. Special Agent Aardweg also testified to matching REA slips used to pick up the footlocker in Philadelphia with the slip number on the footlocker itself.

7. The identification testimony at trial was similar to that at the suppression hearing which is set forth in detail below.

Finally, Agent Robinson, a fingerprint expert employed by the F.B.I., testified that Powell's fingerprints were found on boxes in one of the suitcases seized from the trunk of the car driven by Dougherty.

We turn now to a discussion of the issues raised by the various suppression motions and will then discuss the various errors alleged as arising from the trial. The admission of physical evidence and identification testimony were the subject of extended evidentiary hearings on defendants' motions to suppress. The motion to suppress physical evidence seized from Dougherty's car was denied via a bench opinion several months before trial. The hearings on the defendants' motions to suppress both in-court and out-of-court identifications of certain witnesses and to suppress the silverware seized from the trash pile behind Kulp's home[8] were conducted for the 2½ days preceding trial. The motions were again denied from the bench and we thereupon proceeded with the trial. On September 11, 1973, we entered an order denying the post-trial motions. Following are the reasons why all of the defendants' post-trial motions have been denied.

## II. *The Automobile Search*

Special Agent James Aardweg of the F.B.I. was the principal government witness at the suppression hearing. According to Aardweg, at approximately 3:30 p. m. on March 20, 1972, the Philadelphia office of the F.B.I. received a telephone call from a man who refused to identify himself, stating that the F.B.I. had been interested in a man named Gene Kulp about a year before in connection with some stolen guns. The caller further stated: (1) that Kulp had recently received a large quantity of proof coins that had been stolen in the Dallas, Texas area two days previously; (2) that the coins had arrived in Philadelphia on March 20, 1972; and (3) that a jeweler named Dougherty would be at Kulp's home in Morwood, Montgomery County, Pennsylvania, during the evening of March 20, 1972, to purchase the coins. Agent Aardweg had personal knowledge of the F.B.I.'s prior investigation which was related by the anonymous caller and remembered that Kulp was a subject of the investigation.[9] The Philadelphia office of the F.B.I. contacted their Dallas office in order to ascertain whether there were any reports in the Dallas area of recently stolen proof coins. Later that afternoon, the Dallas office phoned the Philadelphia office and reported that they had learned from the Dallas police that on March 18, 1972, a large number of proof coins and jewelry were stolen from the home of Hoyt Crabtree of Dallas.

Early that evening, Agent Aardweg, accompanied by several other agents, proceeded in two cars to the Limerick Barracks of the Pennsylvania State Police, where they were joined by a state policeman who was familiar with the rural area near Kulp's home in Morwood. While enroute, Agent Aardweg received a radio communication from his supervisor noting that several suitcases were stolen in the Crabtree burglary which presumably were used to transport the coins and jewels from the Crabtree home. The suitcases were described as follows: one unusually large brown leather suitcase with straps and a double zipper, one large black leather suitcase, one small dark blue nylon suitcase or "flight bag" and one blue flowered overnight suitcase. After arriving in the vicinity of the Kulp residence, the agents spent considerable time locating

---

8. A motion to suppress evidence seized from Kulp's residence pursuant to a search warrant was withdrawn.

9. The previous investigation concerning Kulp involved about $100,000 worth of antique guns stolen from the Dallas, Texas area. Agent Aardweg testified that the F.B.I. investigation did not result in any federal arrests because the bulk of the investigation was conducted by the Pennsylvania State Police. We infer from this that Agent Aardweg did not know whether or not Kulp had been arrested by the Pennsylvania authorities.

it because of the rural nature of the area. They finally found the house which was positioned off the main road, and the agents thereupon proceeded to turn around in Kulp's driveway. In doing so, they noticed several Cadillacs and a Volkswagen parked in front and a late model Cadillac backed partway into Kulp's garage attached to the house.

The agents next set up a physical surveillance from a road behind and slightly above the Kulp home. Although they began the surveillance at 9:00 p. m. in darkness and were approximately 200 yards from the home, the house and garage areas were well-lighted. From their vantage point, they could discern several male figures milling about the Cadillac protruding from the garage; the men appeared to be loading some large packages into the car. At 10:30 p. m., as the agents were relocating their point of surveillance, they noticed two of the cars leaving the Kulp home. When the two cars turned onto the main road, the agents followed them. After a short distance the agents turned on their sirens and the cars pulled off the road.

As Agent Aardweg was approaching the Cadillac, the driver opened his car door to get out. At this point, Aardweg recognized the defendant Dougherty as the driver of the car, because he had known Dougherty personally for about 10 years.[10] He did not recognize the defendant Powell. In addition, when the interior car light came on as the door was opened, Agent Aardweg could see from the outside of the car that the suitcases in the back seat of the car matched the description of the suitcases stolen in the Dallas burglary. He observed a very large brown leather suitcase with two leather straps and a double zipper, a small dark blue nylon bag and a blue flowered medium size suitcase. Aardweg also saw another bag that had not been described as stolen but he did not see the large black leather suitcase.

At this juncture, the agents informed both Dougherty and Powell as to their identity and gave them "Miranda warnings." Dougherty and Powell both replied that they were aware of their rights and did not wish to say anything. Because of the lateness of the hour and the fact they were stopped on a narrow road in a rural area, the agents instructed Dougherty and Powell, as well as defendant Dever, who was in the other car with a woman, to follow them to the Limerick State Police Barracks.[11] Upon arrival at the barracks, before proceeding with the investigation, Aardweg called the Assistant United States Attorney on duty in Philadelphia and received advice as to how to proceed. Aardweg thereupon requested Dougherty to relinquish the keys to his car in order to open the trunk. Dougherty acceded to the request and the agents opened the truck and removed therefrom a footlocker and a large black leather suitcase fitting the description which had been transmitted from Dallas. They also removed the previously described suitcases from the rear seat and floor of the car. An REA Air Express shipping tag was appended to the footlocker. It indicated that it had been shipped on March 13, 1972, from Houston to Philadelphia and held for one "B. Dever." All of the suitcases and the footlocker were opened in Dougherty's presence. Only the footlocker might have been locked.) The luggage was found to contain substantial quantities of proof coins, stamps, jewelry and other articles of the kind which had been described as being stolen in Dallas. The defendants were detained for several more hours and then released on the advice of the United States Attorney. The indictments soon followed.

■ The defendants contend that the warrantless search and seizure of the automobile and the suitcases violated their Fourth Amendment rights against unreasonable searches and seizures. The defendants concede that the agents

10. Dougherty was Aardweg's personal jeweler!

11. As noted above, Dever pleaded guilty to three counts of the indictment; the woman was never charged.

had probable cause to conduct a search but argue that exigent circumstances were lacking to justify a warrantless search and seizure, and that it was not a lawful search incident to a lawful arrest.[12] In approaching the question, we start from the premise that notwithstanding the existence of probable cause, warrantless searches are per se unreasonable absent exigent circumstances or some recognized exception to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)

■ As noted above (see n. 12), it is clear that the agents had probable cause to search. However, the defendants first contend that the anonymous phone call at 3:30 in the afternoon of March 20 provided probable cause to search Kulp's home. We disagree and, had had the police gotten a warrant based merely on this phone call, we doubt whether the warrant would have been valid. Indeed, the agents followed the prudent course and continued to investigate the tip. The investigation corroborated the tip in every respect. The final block in the building of probable cause occurred when the agents saw the suitcases that matched the description of those stolen in Dallas and recognized jeweler Dougherty as the driver. Thus, the probable cause consisted of the tip, corroboration of the tip, the independent evidence obtained from the agents' surveillance, and the presence of incriminating evidence in plain view in the back seat of the car. *See* United States v.

McNally, 473 F.2d 934 (3d Cir. 1973); United States v. Moody, 485 F.2d 531 (3d Cir. 1973).

In an earlier opinion, United States ex rel. Johnson v. Johnson, 340 F.Supp. 1368 (E.D.Pa.1972), we analyzed warrantless automobile searches in light of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In *Johnson*, we concluded that the result in *Coolidge* was merely the fruition of the warning in *Chambers* that exigent circumstances do not in every instance accompany the search of an automobile. However, the facts of the present case are governed by *Carroll* and *Chambers* because the car was stopped on the open highway in an isolated, unfamiliar area, at 10:30 p. m., and because the car was movable, making the opportunity to recover the stolen items fleeting. This is a classic automobile search where there existed exigent circumstances to justify a warrantless search.

Our conclusion is bolstered by two recent decisions in this circuit. In United States v. Menke, 468 F.2d 20 (3d Cir. 1972), federal agents had intercepted a ten pound box of marijuana sent from Korea and addressed to Menke at a rural address in New Castle, Pennsylvania. The agents arranged for a controlled delivery to that address. At 4:12 p. m. the agents observed Menke take the box

12. The only defendant to brief this point was Powell, and he expressly conceded probable cause (Powell brief, p. 5). Kulp, whose standing to object to the search of Dougherty's car is at least questionable, in any event adopts Powell's brief on the point, and Dougherty filed motions but no brief. As we stated in our bench opinion, at the time Aardweg stopped the Dougherty car he may not have had probable cause to search it, but he did have sufficient cause to make an investigative stop. *See* United States v. Fields, 458 F.2d 1194 (3d Cir. 1972), cert. denied, 411 U.S. 919, 93 S.Ct. 2755, 37 L. Ed.2d 154 (1973); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612

(1972). However, when Dougherty opened the door and the car light went on, two further elements were supplied: (1) there became visible in the back seat in plain view the unusual looking suitcases matching the description of those taken in the Texas burglaries, and (2) Aardweg recognized jeweler Dougherty, just as mentioned in the informant's tip. At that point, probable cause was clearly established, emanating from the informant's tip, the corroboration thereof, and the independent evidence obtained from the agents' surveillance and their visualization of the suitcases in the back seat of the car.

from the mailbox located about 200 yards from his house and place it in the trunk of his car. At the house he removed a "like appearing" package from the trunk and entered the house at 5:00 p. m. The agents then executed the search warrant issued for the home but were unable to locate the parcel. A search of the trunk of the automobile parked in the driveway revealed the parcel and it was seized.

On these facts the court held that exigent circumstances existed to justify a warrantless search of the automobile. Among other matters highlighted by Judge Aldisert in his opinion for the court were the following: (1) it could not be assumed that after 5:00 p. m. a United States Magistrate or District Judge or other warrant issuing authority would be immediately available in a rural area to issue the warrant; and (2) the goods in question were contraband. *Inter alia* he observed:

> Where an automobile is the subject of the search, the possibility of its movement and the concomitant disappearance of the contraband is a more critical factor than a count of the number of agents present who could be dispatched to a warrant-issuing authority. Even the plurality opinion in *Coolidge,* heavily relied upon by the district court, disclosed: "There was no way in which he could conceivably have gained access to the automobile after the police arrived on his property." 403 U.S. at 460, 91 S.Ct. at 2035. Justice Stewart then explained that after Coolidge was placed under arrest, his wife and child were driven to a relative in another town, "and they stayed with her there until around midnight, long after the police had had the Pontiac towed to the station house." Moreover, Justice Stewart emphasized: "[S]urely there is nothing in this case to invoke the meaning and purpose of the rule of Carroll v. United States . . . no contraband or stolen goods or weapons, no confederates waiting to move the evidence." 403 U.S. at 462, 91 S.Ct. at 2036. In

contrast, here there was contraband. Here, there were three other persons in the residence—the defendant's father, mother and sister. The Korean registry slip was found in the house they occupied. The agents could not have known whether these persons were confederates. And, if they had been, there was nothing to have prevented their moving the car, for they were neither in custody nor under arrest.

Id. at 23.

In United States v. Moody, *supra,* the agents searched an automobile and seized 54 one-gallon jugs of non-tax-paid whiskey therefrom after a chase of several blocks following which the driver fled the car. Judge Hunter upheld the warrantless search. He distinguished *Coolidge* by stating:

> In reviewing the facts of *Coolidge,* two key differences from the typical car search situation are apparent. First, the evidence which provided probable cause did not arise unexpectedly immediately before the search. It was known well in advance, so that the officers had ample opportunity to secure a warrant before the evening of the search, and avoid any delay in the carrying it out. Second, there was no real danger that the car would be moved even if the search were delayed while a warrant was obtained.

485 F.2d at 535 (footnote omitted). And then he noted:

> The *Coolidge* holding, however, does not help the defendant since in this case, unlike *Coolidge,* the basic facts required to make a warrantless car search justifiable, are present. First, probable cause for the search only arose as a result of the defendant's behavior immediately prior to the search. There was no basis, absent that behavior, to secure a search warrant. Second, there was the distinct possibility that the car would be moved and the evidence tampered with if the search was delayed while a warrant was sought since the defendant's

action in leaving the car unattended was ambiguous. While he might have been abandoning it and the contraband it contained, he might well have been leaving it temporarily, with the intent to retrieve it later.

*Id.* at 536 (footnote omitted).

■ Both *Menke* and *Moody* support our conclusion that there were exigent circumstances justifying a warrantless search in this case. The agents' encounter with the Dougherty car occurred at night in a rural area, where no magistrate was likely to be available. The probable cause arose just before the actual search, and the danger was high that the car might be moved and the evidence with it if the search was delayed while a warrant was sought. Contraband was involved and confederates were nearby.

The defendants argue, however, that even if the agents could have conducted a search on the open highway, once they had the defendants and cars in custody, they are required to obtain a warrant for the exigency no longer attaches. This argument has been pointedly rejected in Chambers v. Maroney, *supra.* *See also* United States ex rel. Johnson v. Johnson, *supra.*[13]

■ The defendants refine their argument one step further by contending that the warrantless search of the suitcases is unconstitutional. They argue that if the agents can seize the suitcases they should still be required to obtain a search warrant before opening them. In essence, the defendants contend that the constitutional right to search is separate and distinct from the constitutional right to seize the suitcases. This constitutional concept and the constitutional significance of suitcases or movable containers as such have been discussed in United States v. Valen, 479 F.2d 467 (3d Cir. 1973) (Adams, J. concurring) and United States v. Vallejo, 482 F.2d 616 (3d. Cir. 1973) (Aldisert, J. concurring).

In *Valen,* two suitcases had been left with an air freight carrier in Tucson to be shipped to the defendant in Scranton, Pennsylvania. An employee of the air freight carrier detected an odor of marijuana, opened the suitcases and found them to be full of marijuana. He called custom agents and told them that he detected an odor of marijuana in the suitcases but he did not disclose that he had opened them. The customs agent proceeded to the airport, detected the same odor and opened the suitcase. The suitcases were given to the Bureau of Narcotics and Dangerous Drugs BNDD for investigation. After another warrantless search by BNDD agents, they arranged for a controlled delivery in Scranton. The defendant picked up the suitcases and was arrested leaving the airport in his car. The trunk was opened and the suitcases were seized. The court held that the warrantless searches and seizures were constitutional because the agents had probable cause and there were exigent circumstances. With regard to the first search at the airport,[14] the court balanced the nature of the goods and its mobility against the time which would be required to obtain a search warrant.[15] Given that the object of the search was marijuana, that the suitcases were highly mobile,

---

13. The record also reveals that Dougherty voluntarily gave the keys for the car trunk to Special Agent Aardweg and was present when the F.B.I. agents opened the car trunk and removed a large black metal footlocker. A state trooper was also present. (N.T. 271–72.)

14. While the court treated the seizure of the suitcases from the defendant's automobile as a separate search, the court summarily upheld that search on the basis of United States v. Menke, *supra.*

15. Judge Aldisert wrote:

The "exigent circumstances" exception is not a per se rule to be applied indiscriminately to every automobile containing contraband, nor should it be applied to every object that has the capacity for movement. Rather, its application should depend upon an evaluation of attendant circumstances. United States v. Valen, *supra* at 470.

and that it would have taken at least six hours to obtain a search warrant, the court found these facts to constitute exigent circumstances. The court also rejected the argument that the agents were limited to seizing the suitcases and detaining them until they procured a search warrant; the court relied on the rationale of Chambers v. Maroney, supra.[16]

Judge Aldisert, in his lengthy concurrence in United States v. Vallejo, supra, applied a similar rationale to a situation where a defendant was lawfully arrested pursuant to an arrest warrant in an airport while carrying luggage. Judge Aldisert took the position that the evidence seized from the suitcase as a result of a warrantless search one hour later at the United States Customs House was lawful as a search incident to arrest.[17]

Valen and Vallejo thus require us to reject the defendants' arguments that, notwithstanding the existence of probable cause and exigent circumstances which justified the warrantless search of the car, it was still necessary to procure a search warrant before opening the suitcases.

## III The Motions to Suppress Identifications

### A. Ollie Johnson

■ Ollie Johnson (Johnson) testified at the suppression hearing that during the 3–11 p. m. shift on March 18, 1972, at the Dallas airport several men approached the counter and discussed with him how much it would cost to ship their luggage to Philadelphia. The men were in front of the counter at all times and about three feet away. The whole transaction lasted about 15–20 minutes. Johnson described the man who did the talking as follows: tall, slender, late 30's, white, 6', 160–70 pounds, some grey hair, sideburns, and clean-shaven. He described his companion as younger, 200 pounds, beard, and long brown hair. He remembered the incident because the baggage was unusually heavy. Several weeks later Special Agent Mullins asked Johnson if he recognized any of those men in the group of photos that he handed to Johnson. Special Agent Mullins in no way indicated that the photos of any suspects were contained in the group or otherwise suggested the defendants' photos to Johnson. From the

16. In his concurring opinion, Judge Adams commented:

If the issue presented in this appeal were one of first impression, I would be inclined to distinguish "searches" from "seizures" for the purpose of determining to what extent, if any, the government may properly (1) detain a person's suitcase (seizure), and (2) examine its contents (search), without first obtaining a warrant before either step (1) or step (2).

The Court here holds that under the "exigent circumstances" doctrine both the warrantless seizure of appellant's suitcase and the warrantless search of its contents squares with the requirements of the Fourth Amendment. My view, as applied to the present case, would be that while sufficient probable cause existed for the warrantless seizure of appellant's luggage, the subsequent warrantless search of the suitcase's contents by Agent Clements violated the Fourth Amendment.

\* \* \* \* \* \* \*

It appears, however, that the Supreme Court, in Chambers v. Maroney, 399 U.S.

42, 51–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), has rejected any such proffered distinction between warrantless searches and warrantless seizures. And, since Chambers is not in my judgment, sufficiently distinguishable from the present case to permit either a different analysis or result here, I am impelled to concur in the result reached by the majority opinion. United States v. Valen, supra at 472 (footnote omitted).

17. Judge Aldisert reasons that the luggage was seized at the airport at the time of the arrest and that a warrantless search later at a different place is therefore incident to the arrest because they would have had the right to search the luggage at the airport. In other words, if the seizure is proper at one location, then the actual search conducted elsewhere is likewise proper as long as there is a reasonable justification for the bifurcation and it is reasonably related in time and place to the location of the seizure.

six photos viewed by Johnson, he was "pretty sure" that Powell was the man who did the talking on the night of the 18th and he thought that Dever was the man accompanying Powell at that time.

Having viewed the photos and heard the testimony surrounding their display, we found that the out-of-court identification was not so suggestive as to be violative of due process, and we refused to suppress it. *See* Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In addition, applying the criteria enunciated in United States v. Higgins, 458 F.2d 461 (3d Cir. 1972), we found alternatively that Johnson had an independent basis for an in-court identification.[18] A second look at the conclusion persuades us that it was correct. Tracking the *Higgins* criteria, we note that the identification was conducted in a fair manner; Johnson had ample opportunity to observe Powell; there were no significant discrepancies between Powell's actual description and that given by Johnson prior to the photographic identification; Johnson had never previously identified Powell, nor had he mis-identified him; and the time lapse between the events and the out-of-court identification was brief.

### B. *Donna Kay*

At the pretrial suppression hearing, Miss Kay testified that she was a stewardess on American Airlines flight 442 from Dallas to Philadelphia on the morning of March 19, 1972. Her testimony indicates that two men matching the descriptions of Dever and Kulp were on board the Dallas to Philadelphia flight. She recalled that particular flight because it was one of the few times that she worked in the first class section of the plane. She remembered Dever and Kulp because they looked out of place in first class due to their appearance and dress; they were casually dressed, unlike most suit-clad businessmen who usually fly first class. And one was very tall and thin while the other was short and heavy, a contrast that attracted her attention. In addition, she noted that they were unusually quiet and idle during the flight. She also described Kulp's hair color as "blondish" and testified that she remembered his having craggy facial features, like high cheekbones and a thin strong jaw. Miss Kay was a very forthright and candid witness and very certain about her memory of those men. Her descriptions favorably matched the actual appearance of Kulp and Dever.

About two weeks after the flight, Miss Kay was shown a spread of photos from which she identified Dever and Kulp. However, we suppressed the out-of-court identification because of the inadequacy of the photo spread. (It contained too few photographs, although we could not and did not find that the display was suggestive.) We thereupon heard evidence on whether there was an independent basis for Miss Kay's in-court identification. Some difficulty arose when Miss Kay stated on cross-examination that she would not now be able to identify the men on the flight if she had not been shown the photospread which had been suppressed. After further questioning, however, we were satisfied that her statement meant that the viewing of the photographs merely caused her to focus on that particular flight and that if she had not been called upon to do so shortly after the flight, she probably would have forgotten about the particulars of the flight

---

18. In *Higgins*, Judge Rosen enumerated the following seven factors for determining if there is an independent basis for an in-court identification:

(1) the manner in which the pretrial identification was conducted; (2) the witness' prior opportunity to observe the alleged criminal act; (3) the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification; (4) any previous identification by the witness of some other person; (5) any previous identification of the defendant himself; (6) failure to identify the defendant on a prior occasion; and (7) the lapse of time between the alleged act and the out-of-court identification.

and been unable to identify anybody on it more than a year later. Therefore, it was not the inherent suggestiveness of the photographs (for indeed we made no such finding) that allowed her to identify the defendants; they only served as the impetus to recall the descriptions of the defendants and identify them. Moreover, Miss Kay testified that she could not remember anything about the photographs themselves. We also found that the agent's statement to her that she had correctly identified the defendants did not taint the in-court identification; she testified that her ability to identify the men at trial was not aided by the agent's statement.

■ In terms of the *Higgins* criteria (see n. 18), we were singularly impressed with the vividness of Miss Kay's description of Kulp and the considerable length of time that she had to observe him. Indeed, she recalled things about Kulp (hair color, height and facial characteristics) as well as events (those happening on the plane) which could not have been suggested by a photograph. We note too that Kulp has an unusual and distinctive face. As we viewed the totality of the circumstances attendant to Miss Kay's identification, and her forthrightness and candor, we credited her testimony upon review and reaffirm our conclusion that the events of the photographic display did not taint her present ability and that she had an independent basis for her in-court identification.[19]

### C. *Thomas Burns*

Thomas Burns (Burns), a member of the REA Air Express crew working at the 30th Street Station, had identified Kulp and Dever as two of the people who had received luggage on or about March 20, 1972, sent from Dallas, Texas. Burns had identified Kulp and Dever from a photospread shown to him a few weeks after March 20th by a special agent of the F.B.I. Kulp moved to suppress the out-of-court identification of Burns as having been impermissibly suggestive and, further, contended that the unlawful photospread tainted the in-court identification.

According to the evidence at the suppression hearing, Burns was approached by the F.B.I. in early April 1972 and asked if he remembered a particular shipment from Dallas about March 18, 1972. He testified that he did remember a particular shipment and certain of the people involved because of the unusual weight of the suitcases and because of certain conversations with the individuals. In particular, when Burns attempted to lift one of the ordinary-looking suitcases and discovered how unusually heavy it was, he turned to Kulp and asked whether he had his mother-in-law in the suitcase. He also testified that he noticed a gun rack in back of the truck used by the defendants and initiated a short conversation with Kulp about whether he did "some gunning." Burns identified one man as heavy-set, bearded and as the one who talked a lot, stating too that this man was giving the REA workers a "hard time." The other man was described as tall (more than six feet), Caucasian, in his late 40's or early 50's, thin face, grey, wavy hair, and wearing a small goatee. Burns was on an REA truck unloading the suitcases and the tall man was at street level. The men were in his presence about 5 to 10 minutes at a distance of ten feet. Mr. Burns was then shown a photospread from which he chose the photos of Dever and Kulp as the two men he recalled having been present on that day. After the identification, the agent said nothing more to Burns and concluded the interview.

We suppressed the out-of-court identification of Kulp by Burns mainly on the

---

19. Kulp has also argued that Miss Kay's description was at variance with that given by Burns and an F.B.I. agent concerning a small goatee worn by Kulp. While discrepancies must be considered when determining independent basis, United States v. Higgins, *supra*, we do not find it significant when the remainder of her detailed description is accurate.

basis that Kulp was the only man who appeared in the photospread to be in the same age bracket as related by Burns. Therefore, we had to determine whether there was an independent basis for an in-court identification. In so doing, we considered the testimony which we have just recited. We also noted that in the suppression hearing, Burns testified that he could remember only vaguely the photographs, but that he did remember the man from the experience at REA. Based on the totality of the circumstances, we found that there was an independent basis for an in-court identification by Burns.

In reaffirming that conclusion, we are guided by the criteria enumerated in United States v. Higgins (see n. 18 *supra*). With respect to the first criterion, there was nothing suggestive about the manner in which the pretrial identification was conducted. Moreover, we find that any suggestive effect of the photos themselves is strongly outweighed in terms of the second *Higgins* criterion, for we find that Burns had an excellent opportunity to observe Kulp. While his attention may not have been focused on Kulp for the entire 5–10 minutes that he was present, the fact that he did have at least two conversations with Kulp, coupled with the fact that he gave an accurate description of Kulp before he was shown any photos, convinces us that his recollection stemmed from his memory of the incident and not the photos. Our conclusion is strengthened markedly by the bizarre aspect of the encounter which Burns remembered so vividly—the unusual weight of the suitcase which prompted his remark about

whether it contained Kulp's mother-in-law. In addition, it appeared that Burns had an interest in hunting so that it was not surprising that he remembered the conversation about the gun rack. These events appeared to be enough out of Burns's daily routine to be recalled several weeks later. With regard to the third *Higgins* criterion, we do not place great weight on any discrepancies concerning the existence of a goatee on Kulp, since Kulp could easily have shaved a goatee. With regard to criteria four and six, Mr. Burns had neither made any prior misidentification nor failed to identify Kulp previously. The seventh *Higgins* criterion also is satisfied since the time between Burns' encounter with Kulp and his out-of-court identification was not unreasonably long.

With regard to criterion five (previous identification of Kulp), we expressed some concern at the hearing about an accidental confrontation in the courthouse hallway. During a recess, Burns was seated in the hall outside of the courtroom. Also present around a corner and next to the door leading into the courtroom was a deputy United States Marshal along with Kulp.[20] Mr. Burns noted that he saw 15–20 people in the same area while he was waiting there. The United States Attorney approached Burns and, without directing his attention to any particular individual, asked Burns if he saw anybody that looked familiar to him. He stated that the man (Kulp) squatting in the corner by the door with a cigarette looked like the man who had had the goatee and who had picked up the luggage at REA.[21]

---

20. There is no evidence that Kulp appeared to be in custody, as indeed he was not (N.T. 231).

21. The United States Attorney later admitted that the confrontation was not the most prudent course to have followed. He explained that he was attempting to save the court and the parties much time, for if Mr. Burns could not recognize Kulp then there would be no in-court identification and no need for further testimony by Burns. In

addition, with the photospread suppressed, he would not be called at trial. It should be noted, however, that Burns testified that during the time he was sitting in the hall he saw 15 to 20 people moving back and forth, that the Assistant United States Attorney did not suggest to him that he would see someone in the hall that he would recognize from the incident at REA, and that the prosecutor had not indicated that it was a good thing that he had pointed out Kulp.

This incident in the hall took place after Burns had given his testimony in the suppression hearing.

The incident did not appear to have any impact on Burns with respect to his ability to identify Kulp and we do not feel that the incident was unduly suggestive to Burns or prejudiced his in-court identification. Having seen and heard Burns, we feel that the incident did not draw his attention to Kulp as the suspect or as the one who was present at REA. Nor did he appear to comprehend the purpose of the United States Attorney's question in the hallway. Our conclusion that the accidental counselless confrontation did not give rise to a substantial likelihood of misidentification is reinforced by the recent case of United States v. Furtney, 351 F. Supp. 671 (W.D.Pa.1972), remanded on other grounds, 454 F.2d 1 (3d Cir. 1972). In that case, the court held that where (1) the prosecutors did not intentionally arrange a pre-trial confrontation between the witness and defendant in the corridor, (2) the prosecutors did nothing to focus the attention of the witness on the defendant, and (3) the witness's identification of the defendant in the corridor was spontaneous, then neither the defendant's Sixth Amendment rights nor his rights to due process were violated.

In light of these findings in relation to all of the Higgins criteria, we again find that there was a sufficient independent basis for Burns's in-court identification of Kulp.

IV. *Refusal to Permit Defendants to Withdraw From the Stipulation*

As we have noted, before the trial defendants Powell, Kulp and Dougherty entered into two stipulations with the government regarding counts IV and V of the indictment.[22] The first stipulation provided that the goods found in the car driven by Dougherty and in which Powell was riding when stopped by the F.B.I. agents were the same goods that had been stolen a few days earlier from the three identified Texas homes. The second stipulation recited that the stolen goods noted in the first stipulation had a value of $5,000 or more. There is, of course, nothing remarkable about these stipulations; indeed, based upon long experience, it is our observation that more often than not the defense will not put the government to the generally needless expense of bringing in witnesses to prove ownership. The defense generally (and properly) feels that it does its case no good for the jury to see the innocent and injured property owners lament the theft of their valuable belongings, particularly if they come 2000 miles to do so. And it can hurt the defendant's position with the prosecutor in terms of sentencing recommendations if he puts the government to unnecessary expense.

In this particular case, the government had an additional reason to call one of the individuals whose property was stolen. Since some of Mrs. Fennekohl's silverware was found in Kulp's trash pile, the government wanted Mrs. Fennekohl to connect it to the case (even though it was not listed in the appendix to the indictment as stolen goods).[23] What "upset the apple cart" was that it appeared in the midst of the trial that Mrs. Fennekohl had developed a slipped disc problem that prevented her from coming to Philadelphia. At that point, counsel for Kulp and Powell both moved for a mistrial. Counsel for Kulp also moved to strike count IV or to withdraw the stipulation dealing with goods stolen from Mrs. Fennekohl's residence. We denied these motions.[24]

The moving defendants now contend that it was error not to allow the withdrawal of the stipulation regarding

---

22. Count IV dealt with the goods stolen from the home of Arthur and Diane Fennekohl; count V dealt with the goods stolen from the homes of J. E. Bush and Hoyt C. Crabtree.

23. See note 27, *infra.*

24. See generally N.T. 476–99.

counts IV and V. They argue that they entered into the stipulation on the government's implied representation that all witnesses were ready and available to testify, and that since that implied representation was not in fact true, the entire stipulation is tainted by fraud, accident or mistake and therefore, should not bind them. Kulp makes the additional claim that the facts stipulated could not be established by evidence independent of the stipulation. In rejecting defendants' motions on this issue, we address all of these arguments.

■ A court may allow a party to withdraw from a stipulation if the moving party can prove that he relied to his detriment on representations that were untrue, or that the stipulation stemmed from fraud, accident, mistake, inadvertence, surprise, or excusable neglect, or that some other reason justifies relief. *See* Norwich Pharmacal Co. v. Rakway, Inc., 189 F.Supp. 348 (E.D.Pa.1960); Rarick v. United Steelworkers of America, 202 F.Supp. 902 (W.D.Pa.1962). *Norwich* notes that mere inadvertence or inattention of counsel is not enough to avoid a stipulation in the absence of fraud, accident or mistake. *Rarick* holds that no relief from a stipulation will lie where it was based on the conscientious and informed estimate by counsel of the party's legal chances and where no showing is made that the stipulation was procured by coercion, fraud, or under exceptional or compelling circumstances. *Cf.* United States v. Vasquez-Velasco, 471 F.2d 294 (9th Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 2163, 36 L.Ed.2d 692 (1973) (the court refused to allow a defendant to withdraw a guilty plea when the defendant discovered the chief government witness had died after the plea was entered).

Where a court has felt it necessary to prevent an injustice, particularly where facts contrary to the stipulation are established by evidence, then the court may relieve a party from a stipulation. Albee Homes, Inc. v. Lutman, 274 F. Supp. 875 (E.D.Pa.1967), aff'd in part and dismissed in part 406 F.2d 11 (3d Cir. 1969).[25]

■ In the present case, the defendants were not deceived and did not rely as such on any misrepresentations in agreeing to the stipulation. They presented no evidence to show that they entered into these stipulations for any reason other than as a tactical decision to avoid having such testimony presented to the jury directly. Nor do they allege that Mrs. Fennekohl's inability to appear is an indication of bad faith by the prosecution. In fact, they concede that the Assistant United States Attorney has been the model of an honest prosecutor.[26] Moreover, even if defendants proved that they had relied on the prosecution's representations, they have not even contended, much less proved, that the facts in the stipulation are untrue. In particular, there is no indication that Mrs. Fennekohl would not have identified the silverware in question if called to do so. The fact that she injured her back just before trial and was therefore unable to appear does not negate the substance of the stipulation. The defendants failed to prove that the stipulation was inaccurate in substance or that the government acted in bad faith to deceive defendants into entering into the stipulation. Indeed, the fact is that it is they who seek to take unfair tactical advantage because of Mrs. Fennekohl's unfortunate illness. We hold, therefore, that both the government and all the defendants and their counsel are

---

25. Since most of the cases dealing with relief from stipulations arise in civil litigation, see also F.R.Civ.P. 60(b)(1) and (b)(6) and cases arising under this rule.

26. N.T. 485–86. The government conceded that it failed to contact or subpoena the witnesses named in the stipulation to confirm their availability for trial. But the prosecutor believed they would be available in view of their prior statements to F.B.I. agents, their self-interest in the outcome, and their economic ability to appear. (N.T. 479–90.) The prosecutor further assumed that the F.B.I. agents had contacted these potential witnesses about coming to trial, but his assumption was incorrect.

bound by the stipulation, and that it was not error to refuse to permit them to avoid it.

## V. *The Refusal to Grant a Mistrial With Respect to the Burnt Silverware*

After the night of the surveillance and seizure of the suitcases from Dougherty's car, the F.B.I. procured a search warrant for Kulp's house. In the course of executing it they found in a trash dump about 200 yards behind the house some silverware which was charred, apparently from an aborted burning in the trash pile. Kulp filed a motion to suppress the evidence on the grounds that the search warrant was limited to Kulp's house. We ruled that the trash dump was not outside the scope of the warrant and that in any event the silverware had been abandoned. Although the silverware was not mentioned in the indictment, hence was not a part of the stipulation referred to in the preceding section of this opinion, the government apparently had learned that it belonged to Mrs. Fennekohl and included it in its plans for trial of the case.[27] To that end, it placed the charred silverware in a pile of exhibits (consisting mainly of the suitcases) in front of the jury box, and the prosecutor referred to it in his opening statement, indicating to the jury that Mrs. Fennekohl would come to identify it. When it was learned that Mrs. Fennekohl was incapacitated, the defendants moved for a mistrial.

At that juncture, we held an extended hearing in chambers. (See N.T. 463–70 and 476–99.) We then granted defendants' motion to strike the charred silverware from the record and issued a strong cautionary charge to the jury. We reminded the jury that opening statements are NOT evidence and instructed them to disregard totally and completely the evidence pertaining to the burnt or charred silverware. We stated that such evidence had no bearing on this case and was not to be considered in any respect in the jury's deliberations. Further, at the request of defense counsel, we supplemented our cautionary instruction by stating that: (1) if the jury should consider such evidence they would violate their oath (N.T. 502–505, 522–23); and (2) in reiteration, the arguments of counsel are NOT evidence. (N.T. 628.) *Cf.* Gladden v. Frazier, 388 F.2d 777 (9th Cir. 1968), aff'd sub nom. Frazier v. Cupp. 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 680 (1969).

■ All three defendants now make post-trial motions for arrest of judgment and/or a new trial and/or an acquittal on the grounds that the prosecution's use of this silverware prejudiced the jury. However, no such prejudice has been demonstrated by the defendants. In light of the strong cautionary charge and our belief that the jury was attentive, intelligent and committed to its oath, we find that jury was not prejudiced by the government's use of the silverware.

## VI. *Powell's Motion for Severance*

■ Rule 14 of the Federal Rules of Criminal Procedure provides:

*Relief From Prejudicial Joinder.* If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the de-

---

27. Although the charred silverware found in the trash dump was not specified in the indictment, we ruled initially that the mere fact that these goods were not mentioned in the indictment does not foreclose the government from referring to them. N.T. 253–54.

fendants which the government intends to introduce in evidence at the trial.

This rule preserves the long-standing tradition that the trial judge has broad discretion in deciding when severance of defendants is necessary, subject to review only for clear abuse. United States v. Rickey, 457 F.2d 1027 (3d Cir. 1972). As a general rule, defendants charged with jointly committing a crime are to be jointly tried. United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971). Interests of convenience, economy and efficient administration of justice dictate that persons joined in the same indictment or crime should be tried together, particularly where proof will be extensive and numerous witnesses must be summoned. *See* United States v. De Larosa, 450 F.2d 1057 (3d Cir. 1971), cert. denied, 405 U.S. 927, 957, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). United States v. King, 49 F.R.D. 51 (S.D.N.Y.1970). Only if prejudice clearly results from trying defendants together might a trial court abuse its discretion for failing to sever. United States v. Rickey, *supra*, 457 F.2d at 1030. And the defendant asking for severance has the burden of proving such prejudice. United States v. Taylor, 334 F.Supp. 1050 (E.D.Pa.1971), aff'd, 469 F.2d 284 (3d Cir. 1972); United States v. Lawson, 334 F.Supp. 612 (E. D.Pa.1971).

 Powell contends that the Court erred in not granting his motion for severance, since there was no conspiracy charge and since some of the evidence introduced against the other defendants would not have been admissible against Powell if he had been tried separately. However, Powell's contentions misconstrue the principles of law emanating from Rule 14. Defendants need not be charged with conspiracy in order to be tried together. Powell cites no case to support his assertion to the con-

trary. Similarly, it is immaterial that testimony and evidence introduced against one co-defendant would technically be inadmissible at a separate trial of another defendant. United States v. Kenny, 462 F.2d 1205 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 234, 34 L. Ed.2d 176 (1972).

 The principal consideration in ruling on the severance motion was whether a consolidated trial would be so prejudicial to a defendant that it outweighed the convenience, economy, and efficient administration of justice which the government and all the defendants deserve.[28] We find no such prejudice from our denial of severance. The fact that several witnesses identified Gene Kulp did not prejudice Robert Powell, who was identified and connected with the crime by other witnesses. No inflammatory evidence was presented against Powell's co-defendants. Furthermore, we explicitly instructed the jury that they must consider the evidence against each defendant independently and that they must make an independent evaluation of the evidence with respect to each defendant and an independent evaluation of the guilt or innocence of each defendant. N.T. 647–48 and 659. There was ample independent evidence against Robert Powell, including the identification by Ollie Johnson in Dallas, his presence in the automobile in which the stolen property was contained, and his fingerprints on some of the contraband.

## VII. *The Missing Witness Charge*

Powell contends that the Court erred in not charging the jury with a "missing witness" charge as requested in defendant's point for charge # 14. Specifically, Powell's proposed charge read:

> If a witness is available to the Government, and the witness has knowledge of facts *germane* to the facts of the case and that witness was not

---

28. The instant case posed no problems of cross-inculpatory statements of defendants as were raised in Bruton v. United States,

391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

called or produced by the Government, and the Government fails to give any reasonable explanation for their failure to call that witness, then you may infer that his or her testimony would have been favorable to the defendant, if the witness had been called by the Government.

However, we find that neither the law nor the facts would have justified granting Powell's request for this "missing witness" charge.

■ The long-standing rule is that: "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates a presumption that the testimony, if produced, would be unfavorable." Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1031 (1893). *See also* 2 Wigmore Ev. § 286–88 (3d ed.). No inference is allowable where the person in question is equally available to both parties. Wigmore, *supra* at § 288. For obvious reasons of practicality, failure to call a witness who would provide merely cumulative evidence need not raise an adverse presumption. United States v. Hines, 470 F.2d 225, 230 (3d Cir. 1972), cert. denied, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973); United States v. Restaino, 369 F.2d 544, 547 (3d Cir. 1966). Again, defendant Powell misconceives the rule in arguing that the government must produce every witness with any germane knowledge of the facts or else give a reasonable explanation for why it fails to call such a witness.

■ In particular, Powell complains that Mrs. J. Smithson, an employee of REA in Dallas, Texas, was not called. However, the government had already called her co-worker, Ollie Johnson, to testify as to Powell's identity. Mrs. Smithson was not peculiarly within the power of the government; she was not a government employee or agent. Furthermore, she was as readily available to Powell as to the prosecution, since she was sitting in the United States Attorney's reception room only 20 feet away from the courtroom in which the trial was being held. Had Powell really wanted her to testify, he could have subpoenaed her.

## VIII. *Sufficiency of the Evidence as to Dougherty*

Defendant Dougherty has questioned the sufficiency of the evidence to sustain a conviction.[29] When we instructed the jury, we recited each of the elements of the crime, 18 U.S.C. § 2315, which they had to find beyond a reasonable doubt in order to convict Dougherty. These bear repetition here. First, the government had to prove that goods, wares, merchandise, securities, or money were stolen. Next they had to establish that the stolen goods had a value of $5,000 or more. Third, they had to demonstrate that the stolen property moved in interstate commerce. Fourth, the government was required to convince the jury that the defendant received, concealed, stored, bartered, sold, or disposed of these stolen items. Finally, the prosecution had to prove that the defendant knew that the goods at issue were stolen.[30]

■ The first three of these elements are supported by the evidence in the stipulations. The fourth criterion of "receiving or concealing" relates to the question of whether Dougherty had possession, dominion, or control over the stolen goods. Two F.B.I. special agents

---

29. Related to this motion is Dougherty's claim that without the stipulation, the government presented no evidence that the goods found by the police in the car driven by Dougherty were in fact recently stolen from the Texas homes or from anywhere else and were worth more than $5,000. We have, however, already ruled, *supra*, that the stipulations are binding and relevant evidence against defendants.

30. The government did not need to prove that defendant had knowledge that the stolen goods moved in interstate commerce. United States v. Hamilton, 456 F.2d 171 (3d Cir.), cert. denied, 406 U.S. 947, 93 S.Ct. 2784, 37 L.Ed.2d 402 (1972).

testified that they stopped a car driven by Dougherty and containing the stolen goods. The stipulations also confirmed these facts, which were uncontested by the defense. When one drives an auto laden with contraband, there is a substantial basis from which the trier of fact may infer that the driver had knowing possession of the contraband. United States v. Zamora-Corona, 465 F. 2d 427 (9th Cir. 1972). In the present case, Dougherty had gone out of his way to a remote rural area to have several large, heavy, and distinctive-looking suitcases and a footlocker loaded into the car he proceeded to drive. In light of such facts, it was not unreasonable for the jury to have concluded that Dougherty, as the driver of a car with stolen goods, had sufficient possession, dominion, or control to constitute having received the goods.[31]

The final question in this area is whether there was sufficient evidence for the jury to find that Dougherty knew the goods he had received were stolen. We instructed the jury that "possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which the jury may reasonably draw the inference and find in light of the surrounding circumstances shown by the evidence in the case that the person in possession knew the property had been stolen." (N.T. 642.) This identical instruction was upheld recently by the Supreme Court as comporting with due process. Barnes v. United States, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). See also United States v. Rispo, 470 F.2d 1099 (3d Cir. 1973) (citing United States v. Bamberger, 456 F.2d 1119 (3d Cir.), cert. denied, 406 U.S. 969, 93 S.Ct. 3067, 37 L.Ed.2d 1040 (1972)); United States v. Hamilton, 457 F.2d 95 (3d Cir. 1972).

In the present case, the stipulation establishes that the goods were stolen on or about March 12th, March 16th, and March 18, 1972, and were discovered in the car driven by Dougherty on or about March 20, 1972. This time span is short enough for the jury to have drawn a reasonable inference that Dougherty knew the property was stolen. See United States v. Hamilton, 457 F.2d 95, at 99 (3d Cir. 1972); United States v. Riso, 405 F.2d 134 (7th Cir. 1968). Such an inference is also supported by other facts and circumstances revealed by the record. Special Agent Aardweg testified that he knew Dougherty was a jeweler, since Aardweg had bought his watch from Dougherty and used him as his personal jeweler. The F.B.I. agents also testified to the fact that in the late evening of March 20, 1972, they staked out a surveillance of Kulp's residence in a rather isolated rural area and observed several men loading the car that they eventually stopped and discovered was driven by Dougherty and contained the stolen goods. None of the defendants, including Dougherty, gave any explanation that would lead the jury to believe that Dougherty's involvement was the result of an accident, mistake, or innocent reason.[32]

Since the jury returned a guilty verdict, the government is entitled to have us view the evidence in the light most favorable to it. United States v. Hamil-

---

31. But cf. United States v. Kelley, 462 F.2d 372 (4th Cir. 1972); United States v. Nitti, 444 F.2d 1056 (7th Cir. 1971); Pearson v. United States, 192 F.2d 681 (6th Cir. 1951); Egner v. State, 495 P.2d 1272 (Alaska 1972). All of these cases are distinguishable however. In Kelley and Nitti the defendant was only a passenger and not the driver of the vehicle in which the contraband was found. In Pearson the driver was performing his normal function of driving a truck loaded with liquor for a liquor dealer, and the driver had no reason to know the liquor

was stolen. In Egner, the driver had no reason to know or even suspect that the small package carried by his passenger was contraband.

32. Allowing the jury to draw an inference of knowledge and guilt unless defendant gives a satisfactory explanation to the contrary does not violate defendant's Fifth Amendment right to remain silent. See Barnes v. United States, supra, 412 U.S. at 843–847, 93 S.Ct. at 2362–2363 and n. 11.

ton, 457 F.2d 95, 99 (3d Cir. 1972). In light of all legitimate inferences which might reasonably be drawn from the proven facts noted above, we hold that there was sufficient evidence for the jury to find Dougherty guilty of the crime charged.

### IX. *Donna Kay's Reference to "Pictures"*

The final assignment of error is Kulp's claim that we should have granted a mistrial when Miss Kay mentioned the fact that she had seen "pictures." [33] The reference arose as the result of a question to Miss Kay "whether there were any people on that flight that you can recall or what you recall about them and what you recall about the event and what makes you recall them if anything." (N.T. 442.) In response she said: "There were two people that were sitting in first class. They were sitting on the right side of the plane towards the back. I remembered them because I was asked to identify pictures which brought back to my memory—" (N.T. 442.). Defense counsel interrupted with an objection. Miss Kay made no further reference to "pictures," so the jury heard only her one spontaneous and isolated mention of it. Furthermore, we gave a cautionary instruction to the jury as follows:

> Members of the jury, there has been some mention of photographs. As of this point you don't know anything about these photographs as to what, if anything, was done with respect to the photographs. Indeed, what, if anything, this witness did with respect to the photographs. We instruct you to consider this witness's testimony as you heard it and as it will evolve, but to disregard any reference whatever to photographs unless that matter is otherwise brought back in. I don't know whether it will be or it won't be.

It has no bearing. It has no relevance. It has no significance in this case. And you are not to consider this witness's testimony with reference to any reference that we just made about photographs, but only on the basis of what she otherwise has and presumably will testify to. (N.T. 444).

Kulp asserts that from Miss Kay's simple reference to "pictures" the jury could infer that Kulp had a criminal record. However, United States v. Hines, 470 F.2d 225 (3d Cir. 1972), cert. denied, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973), disposes of this issue adversely to Kulp. The court in *Hines* recognized that some prejudice may exist when a reference is made to photos of a defendant in the possession of the police but rejected the "mechanical jurisprudence" of the Pennsylvania Supreme Court in Commonwealth v. Allen, 448 Pa. 177, 292 A.2d 373 (1972), in favor of a balancing test.

The facts in the present case are less favorable to granting Kulp's motion for a new trial than they were in *Hines*. Miss Kay's isolated reference to "pictures," which was not in response to a direct question intending to elicit such an answer, would appear to raise less possibility of prejudice than that in *Hines* where photos in the possession of the police were constantly mentioned as part of the case-in-chief and the United States Attorney argued the out-of-court identifications to the jury. We also note that there was no reference to "mug shots." Finally, we gave a cautionary instruction to the jury to disregard any reference made by Miss Kay to photographs. Thus, we find there was a minimal possibility of prejudice to Kulp from Miss Kay's unintended and isolated reference to a photograph of Kulp, and we reject this final ground for post-trial relief.

---

33. In response to a question on cross-examination during the suppression hearing without the jury, Miss Kay first referred to having been shown "pictures" by the F.B.I. We spent considerable time probing at that hearing to determine whether such "pictures" prejudiced Miss Kay's ability to identify Kulp in court. (N.T. 139–45; 147–55.) We concluded that they did not.

### X. Conclusion

We believe that the jury convictions against the defendants should stand since there was a fair trial and full consideration of all of defendants' grounds of contention. Accordingly, by this Opinion we reaffirm our order of September 11, 1973, denying defendants' post-trial motions.